# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RAHEEM JOHNSON,          :
    **Plaintiff**          :
              :          **No. 1:18-cv-203**
    **v.**          :
              :          **(Judge Rambo)**
**DEPUTY TRITT**, *et al.*,          :
    **Defendants**          :

## <u>MEMORANDUM</u>

This matter is before the Court pursuant to the second motion for summary judgment (Doc. No. 86) filed by Defendants Deputy Tritt ("Tritt"), Superintendent Brittain ("Brittain"), Nurse Holly ("Holly"), C.O. Dowd ("Dowd"), Superintendent Delbalso ("Delbalso"), C.O. Mros ("Mros"), Bowser ("Bowser"), Captain Moore ("Moore"), Secretary Wetzel ("Wetzel"), and the Department of Corrections ("DOC")[1], as well as the motion for summary judgment (Doc. No. 100) filed by Defendant Dr. Pandya ("Pandya"). The motions are fully briefed and ripe for disposition.

## I.     BACKGROUND

*Pro se* Plaintiff Raheem Johnson ("Plaintiff"), who is currently incarcerated at the State Correctional Institution in Chester, Pennsylvania ("SCI Chester"), initiated the above-captioned action in January 2018 by filing a complaint pursuant

---

[1] The Court uses "DOC Defendants" to refer to these Defendants collectively throughout this Memorandum.

to 42 U.S.C. § 1983 against Defendants in the United States District Court for the Eastern District of Pennsylvania. (Doc. No. 5.) On January 26, 2018, the Eastern District of Pennsylvania transferred the action to this Court for further proceedings. (Doc. No. 3.)

Plaintiff alleges that he arrived at SCI Frackville on December 22, 2015. (Doc. No. 5 ¶ 17.) After intake, he was sent to a housing unit and found that he had a "hard time going up the hills a[t] SCI Frackville, due to [his] previous knee injuries." (*Id.* ¶ 18.) Plaintiff subsequently submitted a sick call request. (*Id.* ¶ 19.) Physician's Assistant Iannuzzi prescribed medication "to help relief some pain and swelling of [Plaintiff's] knees." (*Id.*) On February 1, 2016, Plaintiff's "left knee completely bucked and gave out." (*Id.* ¶ 20.) He filed another sick call request and was seen by Iannuzzi on February 4, 2016. (*Id.* ¶ 21.) Iannuzzi evaluated Plaintiff's knees and prescribed a permanent walker to help Plaintiff "keep stable while walking up and down the hills." (*Id.*)

Plaintiff alleges that his medication was stopped by Defendant Pandya after thirty (30) days had passed. (*Id.* ¶ 23.) Plaintiff avers that Defendant Pandya stopped his medication because of Plaintiff's actions of submitting requests and filing grievances. (*Id.*) On April 4, 2016, Plaintiff was called to the medical department, where he was told that his walker was being taken away and he would receive a cane

2

in its place for thirty (30) days.  (*Id.* ¶ 25.)  Plaintiff was also advised to do workouts in his cell.  (*Id.*)  Plaintiff refused the workouts, alleging that he was in too much pain and "could hardly walk let alone do a workout."  (*Id.*)

Plaintiff experienced more pain in his knees after the walker was taken away. (*Id.* ¶ 26.)  The pain "severely limited and impaired [his] ability to walk, sleep, and perform manual task[s]."  (*Id.*)  Plaintiff asked to be provided a chair "to use to shower as [he] could no longer stand without a device to help him."  (*Id.* ¶ 27.)  He also sought permission to use a chair while he used the phone and asked to be provided pain medication again.  (*Id.*)  His requests were denied, and Plaintiff filed a grievance.  (*Id.* ¶¶ 27-28.)

On June 29, 2016, Plaintiff filed an Americans with Disabilities Act ("ADA") request after being told that he could do so by the facility manager in his response to Plaintiff's grievance.  (*Id.* ¶¶ 29-30.)  Defendant Holly also responded to his grievance, telling Plaintiff that his request for a chair needed to be addressed with his unit management team.  (*Id.* ¶ 31.)  Plaintiff alleges that Defendant Dowd continued to deny him a chair, telling Plaintiff that she had asked medical and the deputy, both of which had to approve the chair.  (*Id.* ¶ 32.)  Plaintiff avers that he "further injured himself while showering, as a direct result of being denied [use of] a chair in a non-[handicap] accessible prison."  (*Id.* ¶ 33.)

Plaintiff was sent out to see a therapist on February 17, 2017. (*Id.* ¶ 34.) The therapist noted that Plaintiff was in a wheelchair and that his knees were swollen. (*Id.*) Plaintiff told the therapist that he was "in sever[e] pain." (*Id.*) The therapist suggested that Defendant Pandya provide Plaintiff with pain medications, crutches, and new braces because Plaintiff's "old brace was broken and wor[n] out." (*Id.*) Defendant Pandya, however, told Plaintiff that he would not receive crutches and pain medication. (*Id.* ¶ 35.)

On February 22, 2017, Plaintiff was called to medical to pick up his new brace from Defendant Pandya. (*Id.* ¶ 36.) Defendant Pandya "continued to deny [him] crutches, or pain medication, or anything to reduce swelling." (*Id.*) On February 24, 2017, Plaintiff filed a grievance about the denial of crutches, as well as his pain and the inability to use a chair while showering. (*Id.* ¶ 37.) He also "continued his argument to be placed in a handicap accessible prison." (*Id.* ¶ 38.) On March 1, 2017, Plaintiff received crutches, but his other requests were denied. (*Id.* ¶ 39.)

On April 11, 2017, Plaintiff fell again in the shower. (*Id.* ¶ 40.) He "felt there was something much more damaged after this fall" because he was in severe pain and had more trouble walking, even with crutches. (*Id.* ¶ 41.) Plaintiff avers that his pain became so severe that he had to stop going to the dining hall for breakfast, lunch, and dinner from February 2016 until June 12, 2017. (*Id.* ¶ 42.) Plaintiff avers

that he was unable to travel up and down the hills to and from the dining hall because the walking caused his knees to give out. (*Id.*) Plaintiff maintains that on April 11, 2017, his ADA request was denied with a note that his disability was already reasonably accommodated. (*Id.* ¶ 72.)

Plaintiff maintains that in August 2016, he requested to go to the gym "in order to try to build the muscle tone in [his] knees and ankles." (*Id.* ¶ 44.) On April 24, 2017, Plaintiff was informed that an exercise wheel had been ordered for him to use. (*Id.* ¶ 45.) That same day, he received a response to a grievance from the superintendent stating that Defendant Pandya was still evaluating whether Plaintiff needed an MRI. (*Id.* ¶ 46.) The response also stated that Plaintiff had been seen by a specialist and received physical therapy. (*Id.*) Plaintiff avers that he was never seen by a patella specialist and never received the exercise wheel. (*Id.* ¶¶ 47-48.)

On April 12, 2017, Plaintiff received a brace for his right knee. (*Id.* ¶ 50.) Plaintiff also underwent MRIs of both knees. (*Id.* ¶ 51.) Plaintiff's left knee showed mild effusion of the joint, a "laterally subluxed" patella, and patellofemoral arthritis. (*Id.* ¶ 52.) The MRI also noted "chronic lateral patella instability." (*Id.*) Plaintiff's right knee also showed signs of moderate patellofemoral arthritis. (*Id.* ¶ 53.)

Plaintiff avers that staff at SCI Frackville were made aware of his difficulties. (*Id.* ¶ 63.) Defendants, however, "made no accommodations to enable Plaintiff to

receive his meals in his cell as was done for others." (*Id.* ¶ 64.) Plaintiff informed Defendant Tritt of his difficulties and asked to be transferred to a prison that could accommodate his disabilities. (*Id.* ¶ 66.) Defendant Tritt responded by telling Plaintiff that OPM decides where inmates are placed and that medical would need to support his "need for accommodations other [than] the norm." (*Id.* ¶ 67.)

Plaintiff filed a grievance which was upheld in part to the extent that medical staff would direct that Plaintiff be transferred to a single-level facility. (*Id.* ¶ 56.) Plaintiff was transferred to SCI Mahanoy on June 12, 2017. (*Id.* ¶ 57.) He avers that on August 11, 2017, Defendant Mros denied him use of the handicap-accessible shower because he was upset that Plaintiff "had just mere days before filed a grievance on [him] for denying Plaintiff . . . a shower." (*Id.* ¶ 74.) Plaintiff maintains that he fell in the non-handicap-accessible shower "when his crutches slipped from up under him." (*Id.* ¶ 75.) He landed on the ledge of the shower, hurting his knees, back, and neck. (*Id.*) Staff eventually removed Plaintiff from the shower and placed him in a wheelchair. (*Id.* ¶ 76.) Plaintiff claims that he only received a few Motrin and was charged $10.00 for the medical service. (*Id.* ¶ 77.) Plaintiff grieved the issue, and his grievance was denied at all levels. (*Id.* ¶¶ 80-84.)

Based on the foregoing, Plaintiff alleges that Defendants violated his Eighth Amendment rights by demonstrated deliberate indifference to his medical needs.

(*Id.* ¶¶ 91-92.)  Plaintiff also alleges that Defendants violated his rights under the ADA, the Rehabilitation Act, and the constitution and laws of Pennsylvania by failing to accommodate his disability and provide proper medical care.  (*Id.* ¶¶ 93-95.)  Plaintiff also suggests that Defendant Mros violated his First Amendment right by retaliating against him for filing a grievance.  Plaintiff seeks compensatory and punitive damages, as well as declaratory relief.  (*Id.* at 19.)

After completing discovery, the DOC Defendants filed a motion for summary judgment on December 3, 2019.  (Doc. No. 62.)  In a Memorandum and Order dated April 20, 2020, the Court granted in part and denied in part the motion for summary judgment.  (Doc. Nos. 83, 84.)  Specifically, the Court granted the motion as to: (1) Plaintiff's Eighth Amendment claims against the DOC Defendants; and (2) his claims under the ADA and the Rehabilitation Act against the DOC Defendants in their individual capacities, as well as any claims for prospective injunctive relief under the ADA and the Rehabilitation Act against the DOC Defendants in their official capacities.  (Doc. No. 84.)  The Court denied the motion as to Plaintiff's First Amendment retaliation claim against Defendant Mros.  (*Id.*)  Finally, the Court denied the motion without prejudice as to Plaintiff's claims for monetary damages against the DOC Defendants in their official capacities under the ADA and Rehabilitation Act, as well as his state law claims against the DOC Defendants.  (*Id.*)

The Court noted that the DOC Defendants could file a second motion for summary judgment addressing those claims within thirty (30) days. (*Id.*)

The DOC Defendants filed their second motion for summary judgment and supporting materials on May 20, 2020. (Doc. Nos. 86, 87, 88.) Defendant Pandya filed his motion for summary judgment and supporting materials on November 18, 2020. (Doc. Nos. 100, 101, 104.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element

of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White*, 826 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.* (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. *See Sanders v. Beard*, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); *Thomas v. Norris*, No. 02-CV-01854, 2006 WL

2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

## III. STATEMENT OF MATERIAL FACTS[2]

### A. Facts Related to Plaintiff's Claims against the DOC Defendants

The DOC Defendants have filed a supplemental statement of undisputed facts in support of their second motion for summary judgment. (Doc. No. 87.) They also incorporated their first statement of material facts. (*Id.*) The Court previously set forth those material facts as follows:

---

[2] The Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. L.R. 56. 1. The Rule further requires the inclusion of references to the parts of the record that support the statements. *Id.* Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. *See id.*

Unless otherwise noted, the background herein is derived from the Rule 56.1 statements of material facts filed by the DOC Defendants and Defendant Pandya. (Doc. Nos. 87, 101.) While Plaintiff has filed a responsive statement that complies with Rule 56.1 with respect to the DOC Defendants' statement of facts (Doc. No. 114), his response to Defendant Pandya's statement of facts fails to comply with Rule 56.1 (Doc. No. 116). Plaintiff's verified complaint, however, may be treated as an affidavit in opposition to Defendants' motion for summary judgment. *See Ziegler v. Eby*, 77 F. App'x 117, 120 (3d Cir. 2003) (noting that "the complaint was not verified, thereby precluding the District Court from treating it as the equivalent of an affidavit for purposes of Federal Rule of Civil Procedure 56(e)"); *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as an affidavit on summary judgment motion); *see also Boomer v. Lewis*, No. 06-850, 2009 WL 2900778, at *2 n.4 (M.D. Pa. Sept. 9, 2009) ("A verified complaint may be treated as an affidavit in support of or in opposition to a motion for summary judgment if the allegations are specific and based on personal knowledge."). Accordingly, the Court sets forth the undisputed facts above with footnotes setting forth the parties' relevant factual disputes.

Plaintiff was incarcerated at SCI Frackville from December of 2015 until June of 2017. (Doc. No. 63 ¶ 1.) Plaintiff had pre-existing knee injuries when he arrived at SCI Frackville. (*Id.* ¶ 2.) "Plaintiff had a knee brace, which was replaced while he was at [SCI] Frackville." (*Id.* ¶ 3.)[3] In June of 2017, Plaintiff was transferred to SCI Mahanoy. (*Id.* ¶ 4.)

During the relevant time, Defendants Tritt and Brittain responded to Plaintiff's grievances and inmate requests. (*Id.* ¶¶ 5-6.) Defendant Delbalso responded to his grievance appeals. (*Id.* ¶ 7.) Defendant Bowser "assisted in obtaining an order to have the Plaintiff transferred to a single-level facility." (*Id.* ¶ 8.) Plaintiff also "saw medical staff on numerous occasions, receiving a walker, a cane, a knee brace, crutches, and pain medication at various times." (*Id.* ¶ 10.)[4] On August 11, 2017, Plaintiff was "given the choice of either using a non-handicapped shower or not showering; [he] chose to use the non-handicapped shower and slipped in that shower." (*Id.* ¶ 11.)[5]

*Johnson v. Tritt*, No. 1:18-cv-203, 2020 WL 1911538, at *5 (M.D. Pa. Apr. 20, 2020).

---

[3] Plaintiff avers that his knee brace was not replaced until after February 17, 2017, when he saw a therapist. (Doc. No. 79 at 19.) The therapist recommended that Plaintiff receive crutches, pain medication, and two (2) new knee braces, but he "was dismissed without receiving any of the items." (*Id.*) Plaintiff received a brace for his right knee on February 22, 2017. (*Id.* at 19-20.)

[4] Plaintiff maintains that his "walker was removed for no reason when [it] was to be permanent." (*Id.* at 20.) He avers that Defendants Pandya and Holly "had a part in removing [his] walker" and that he "only received crutches after he filed a grievance." (*Id.*) Plaintiff states further that he did not receive pain medication at times and that Defendant Pandya retaliated against him for filing grievances "by removing [his] medication and as long as [P]laintiff remained under [Defendant Pandya's] care [he] never received any more medication." (*Id.* at 20-21.)

[5] Plaintiff avers that he had to choose between taking a shower "after not having a shower for days" or waiting until the next Monday to take a shower. (*Id.* at 21.) Plaintiff maintains that Defendant Mros forced him to make this decision in retaliation for Plaintiff filing a grievance "against Mros 4-days prior for Mros denying [P]laintiff a shower." (*Id.*)

With respect to their second motion for summary judgment, the DOC Defendants set forth the following facts. The medical department made the decision to take away Plaintiff's cane.[6] (Doc. No. 87 ¶ 1.) Plaintiff "was provided with a cane, walker, crutches, and a wheelchair."[7] (*Id.* ¶ 2.) He was "given crutches to use in the shower when he was not using a handicapped shower."[8] (*Id.* ¶ 3.) "Plaintiff would not go to the dining hall if he was [in too] much pain to go there."[9] (*Id.* ¶ 4.) If Plaintiff "could not go to the dining hall, he would eat commissary in his cell." (*Id.* ¶ 5.)

## B.    Facts Relating to Plaintiff's Claims Against Defendant Pandya

Plaintiff "underwent an MRI of his left knee on November 25, 2009." (Doc. No. 101 ¶ 1.) The MRI "showed patellar dislocation with high grade cortical erosion fracture, subchondral microtrabecular fracture, and bone marrow edema on the lateral aspect of the femoral condyle." (*Id.*) The MRI also "indicated a contusion and tear of the medial patellar retinaculum and a contusion, with no tear, of the

---

[6] Plaintiff maintains that his permanent walker was taken away and he was given a cane, which "was insufficient." (Doc. No. 114 ¶ 1.)

[7] Plaintiff avers that his only use of a wheelchair at SCI Frackville was when he was taken to see a therapist. (*Id.* ¶ 2.)

[8] Plaintiff claims that he has been on crutches since 2017 and had "no other choice but to use a non-handicap accessible shower and denied a simple chair to help [him] wash without injury." (*Id.* ¶ 3.)

[9] Plaintiff states that he did not go to the dining hall for over a year. (*Id.* ¶ 4.)

patella insertion of the quadriceps tendon and the patella tendon." (*Id.*) X-rays taken of Plaintiff's left knee on January 1, 2012 showed "small joint effusion, no fracture or deformity." (*Id.* ¶ 3.) "It was noted that there were no significant changes from 2008." (*Id.*)

On February 3, 2012, Plaintiff saw Dr. William Greer via telemed. (*Id.* ¶ 4.) Dr. Greer assessed a "likely left knee recurrent patellar instability." (*Id.*) Dr. Greer noted that Plaintiff needed updated X-rays as well as an MRI. (*Id.*) "A patella tracking orthosis ('PTO') knee brace was ordered." (*Id.*) Dr. Greer "stated that he did not think [Plaintiff] would be a good candidate for surgery, and instead recommended bracing and physical therapy." (*Id.*) On February 8, 2012, Plaintiff had X-rays taken of his left knee. (*Id.* ¶ 5.) The X-rays showed no acute fracture, and there "was mild deformity of the patella." (*Id.*) "The joint spaces revealed minimal degenerative changes, a small joint effusion, and mild genu varum narrowing." (*Id.*) An MRI done on April 18, 2012 showed "femoral trochlear dysplasia, a chondral defect near patellar median ridge, and small osteophyte projecting superiorly from tibial spine." (*Id.* ¶ 6.) On July 25, 2012, Dr. Greer reviewed the MRI, "noting evidence of lateral patellar subluxation and high grade trochlear dysplasia." (*Id.* ¶ 7.) He stated that there was no surgery he could offer at that time, indicating that Plaintiff's "biggest problem is trochlear dysplasia." (*Id.*)

He noted that Plaintiff "would not do well with any surgery and should be treated symptomatically with oral anti-inflammatories, bracing, and physical therapy." (*Id.*) On February 6, 2014, Plaintiff had X-rays taken of his right knee. (*Id.* ¶ 8.) They showed "no acute fracture or dislocation, the soft tissues were unremarkable, and no erosive changes or effusions seen." (*Id.*)

Plaintiff was transferred to SCI Frackville on December 22, 2015. (*Id.* ¶ 9.) He was seen by LPN Erin Thiroway on December 23, 2015, and "voiced no complaints at that time." (*Id.* ¶ 10.) CRNP Tony Iannuzzi saw Plaintiff on December 24, 2015 and reviewed his chart. (*Id.* ¶ 11.) Plaintiff had no complaints at that time. (*Id.*) CRNP Iannuzzi noted that Plaintiff was "non-compliant with his psychiatry visit and that [he] had hypokalemia (low potassium) and hypertension." (*Id.*) CRNP Iannuzzi noted that he would follow up with Plaintiff to re-check his blood pressure. (*Id.*)

CRNP Iannuzzi saw Plaintiff again on January 4, 2016 to check his blood pressure. (*Id.* ¶ 12.) Plaintiff "advised that he had no commissary because he had just arrived at SCI Frackville, that he used tobacco[,] and had on and off bilateral knee pain for over fourteen (14) years." (*Id.*) He had no new complaints. (*Id.*) Plaintiff indicated that he had "three (3) years of gradually increasing right knee pain, and that he had been experiencing left knee pain for over ten (10) years." (*Id.*)

He noted that he had bilateral knee braces, but reported no slips or falls. (*Id.*) CRNP checked Plaintiff's blood pressure and "planned to follow up for another blood pressure check in ten (10) days." (*Id.*) He also placed Plaintiff "on the MD line to discuss his long history of bilateral knee pain." (*Id.*) That same day, CRNP Iannuzzi placed an order for Plaintiff "to undergo bilateral knee x-rays, both weight-bearing and non-weight bearing, and to place [Plaintiff] on the MD line to evaluate his case history regarding over ten (10) years of bilateral knee complaints." (*Id.* ¶ 13.)

On January 8, 2016, Plaintiff did not show up for an appointment with Defendant Pandya. (*Id.* ¶ 14.) That same day, he had X-rays taken of his right and left knees "while weight bearing." (*Id.* ¶ 15.) "There was no evidence of fracture, destructive bony lesion, or joint space instability. The soft tissues were normal." (*Id.*) CRNP Iannuzzi saw Plaintiff again on January 12, 2016, and assessed "hypertension, tobacco use, and degenerative joint disease ('DJD')." (*Id.* ¶ 16.) He noted that Plaintiff was still smoking and complaining "that his knees hurt too much to walk up the line, stating that it was too hilly." (*Id.*) CRNP Iannuzzi offered pain medication, but Plaintiff refused it. (*Id.*) Plaintiff "stated that he would like a pass to use the exercise bike, stating that it worked really well for his knees." (*Id.*) CRNP Iannuzzi "confirmed that [Plaintiff] was refusing pain medication, despite complaining of knee pain[,] and advised [Plaintiff] that they do not offer exercise

bike passes." (*Id.*) He offered to show Plaintiff "exercises to simulate the bike," but Plaintiff stated that he was not interested. (*Id.*) "Medication for his hypertension was adjusted and Mr. Iannuzzi planned to follow up with [Plaintiff] in ten (10) days." (*Id.*)

Plaintiff saw Defendant Pandya on January 15, 2016 "to discuss several issues, including his chronic knee pain." (*Id.* ¶ 17.) Plaintiff stated that "his knees were 'messed up' and that his knee swells up when he walks a lot." (*Id.*) He told Defendant Pandya that "he could not walk much, that he walked in his shower shoes in the hallway[,] and wears his shower shoes in the shower." (*Id.*) Plaintiff stated that he could not walk long distances. (*Id.*) Defendant Pandya reviewed "the MRI reports and orthopedic not stating that [Plaintiff] had a 3 mm defect on the femoral trochlea." (*Id.*) Defendant Pandya noted that Plaintiff had full range of motion in both knees, and that his "muscle strength and shape in his right knee was good and the muscle in his left medical quad was weak." (*Id.*) Plaintiff complained of "pain when wearing his shower shoes to walk to the showers." (*Id.*) He wanted to "be allowed to wear his boots to the shower and then change into his shower shoes upon arrival at the showers." (*Id.*)

Defendant Pandya also "reviewed and summarized prior medical care related to [Plaintiff's] knees." (*Id.*) He noted that Plaintiff "was now claiming an inability

17

to walk 50-60 feet to the showers due to severe pain." (*Id.*) Defendant Pandya noted that "it was unclear how [Plaintiff] injured his left knee wearing a hinged brace, noting that it was most likely due to [him] not wearing the brace." (*Id.*) Plaintiff also was not interested in an exercise regimen to maintain knee strength, but he was provided materials regarding exercise regardless. (*Id.*) Defendant Pandya's "plan was to consider housing [Plaintiff] in a cell closer to the showers in the unit and ordered a Vitamin D supplement." (*Id.*) Finally, he noted that Plaintiff "would be seen in the hypertension Chronic Care Clinic soon." (*Id.*)

Plaintiff did not show up for his follow-up appointment on January 22, 2016. (*Id.* ¶ 18.) CRNP Iannuzzi saw Plaintiff on January 29, 2016 for a blood pressure check. (*Id.* ¶ 19.) He also "placed an order for [Plaintiff] to be given his Vitamin D supplement as a keep on person medication." (*Id.* ¶ 20.) CRNP Iannuzzi saw Plaintiff on February 4, 2016 for complaints of bilateral knee pain. (*Id.* ¶ 21.) Plaintiff "had a knee sleeve/braces on at that time." (*Id.*) Plaintiff asked for a cane to take the pressure off of his knees. (*Id.*) CRNP Iannuzzi noted that Plaintiff's left knee pain was greater, but Plaintiff "deferred an examination at the visit." (*Id.*) CRNP Iannuzzi's "assessment was [DJD] and osteoarthritis ('OA') as per the MD note of January 15, 2016." (*Id.*) Plaintiff "was prescribed and given a walker, for a period of one year, and Mr. Iannuzzi noted that he would discuss the case with the

18

medical doctor." (*Id.*)  The pain "also included refer of [Plaintiff] to the procedure clinic for [a] possible left knee steroid injection." (*Id.*)

On March 8, 2016, RN Mary Alice Kuras wrote a Progress Note indicating that Plaintiff "had been seen walking from compound with his walker in his hands, but not using the walker for assistance.  His gait was steady and brisk and the walker was barely touching the ground." (*Id.* ¶ 22.)  Plaintiff "was observed walking back up the compound [] without difficulty using the walker in the same manner." (*Id.*) On April 1, 2016, Defendant Pandya reviewed RN Kuras's note and "placed an Order to put [Plaintiff] on his MD line." (*Id.* ¶ 23.)

Plaintiff saw Defendant Pandya on April 4, 2016. (*Id.* ¶ 24.)  Plaintiff stated "that he needed surgery to fix his knee and that there [was] no other way." (*Id.*) Plaintiff told Defendant Pandya that "when he straightens his knee, it locks and clicks." (*Id.*)  Plaintiff indicated that "he has no problem walking on level ground, but that he cannot walk down hills, from his unit to the dining hall." (*Id.*)  Plaintiff reported "swelling in his calf." (*Id.*)  Defendant Pandya noted that Plaintiff had been provided a PTO brace sometime in 2012, but that the condition of the brace was unclear because Plaintiff came to SCI Frackville "wearing it but did not return it as he had his own metal knee sleeve brace." (*Id.*)  Plaintiff stated that he still had the PTO brace in his cell, and Defendant Pandya told him to "discontinue use of the

brace and to return it so it could be inspected for missing parts." (*Id.*) Defendant Pandya "placed an order for, and [Plaintiff] received, a cane for one month—or until May 4th." (*Id.* ¶ 25.) Later that day, Defendant Pandya "placed an order to file exercise papers (8 pages), noting that it wasn't in [Plaintiff's] chart, as [he] had refused it." (*Id.* ¶ 26.) Defendant Pandya also ordered that Plaintiff's hinged knee support be discontinued because Plaintiff was not wearing it, and that it be inspected for missing parts. (*Id.*)

In June of 2016, Plaintiff saw Defendant Pandya in the Chronic Care Clinic for hypertension. (*Id.* ¶ 27.) Plaintiff "stated that he doesn't need a cane and that he needed to use a walker, stating that his knee gives out and he needs surgery." (*Id.*) Defendant Pandya noted that Plaintiff had "poor motivation to improve his muscle strength and that [he] was fixated on a 'magic surgery' to fix his knee issues." (*Id.*) Defendant Pandya gave Plaintiff "exercises to do to build up his muscle strength to assist with his knee pain." (*Id.*)

On October 5, 2016, Defendant Pandya conducted a physical examination of Plaintiff. (*Id.* ¶ 28.) He noted that Plaintiff was using a cane and a knee brace. (*Id.*) Defendant Pandya indicated that Plaintiff "was to continue to use his cane and do range of motion exercises daily." (*Id.*) That same day, Defendant Pandya placed an Order with the following restrictions, to last for one (1) year: "four hour work

restriction, no work at heights/elevation, modified work only, no sports, no weightlifting, non-contact sports only, no pushing, no high risk of injury activities, no squatting, no lifting, and ground level and lower bunk housing." (*Id.* ¶ 29.) Defendant Pandya ordered that Plaintiff "should do no prolonged walking, specifically no walking that exceeded ½ mile." (*Id.*) He noted that Plaintiff "was to have a left knee brace and cane for one year and that [Plaintiff] was mobility impaired." (*Id.*) "Corrections Officer Novak was notified." (*Id.*)

On January 31, 2017, Defendant Holly noted wrote a Progress Note indicating that Plaintiff was scheduled to be seen by Defendant Pandya. (*Id.* ¶ 30.) When Plaintiff "entered the exam room he stated that he was told he has the knees of an 80-year old by a doctor at SCI Somerset." (*Id.*) Plaintiff indicated that he had been in three (3) car accidents and had broken his femur while at SCI Houtzdale. (*Id.*) Defendant Holly asked Plaintiff "about his activities of daily living ('ADLs')." (*Id.*) Plaintiff "advised that he is capable and fully self-functioning with his ADLs." (*Id.*) Plaintiff was "able to feed, dress[,] and bath[e] himself without assistance, advising that when showering he leans against the wall." (*Id.*) Plaintiff "reported no incidents of falling." (*Id.*) Plaintiff went to the yard but did not do any exercise or walking, and he did not come "to pill line when the weather is cold/rainy/snow[y] or just because he has pain." (*Id.*) Plaintiff reported "difficulty in walking up and down

the hill at Frackville." (*Id.*)  Defendant Holly noted that Plaintiff "had not attended the inmate dining hall since July 1, 2016, stating that he eats commissary." (*Id.*)  She noted that Plaintiff "had a sleeve on his right knee and an open patella hinge brace on his left knee." (*Id.*)

Plaintiff also saw Defendant Pandya on January 31, 2017. (*Id.* ¶ 31.)  He complained "that both his knees are like that of an 80-year-old and that he needed to be transferred to a handicap facility." (*Id.*)  Defendant Pandya went through Plaintiff's extensive medical history and noted that he had DJD "in both his right and left knee, with his left being worse." (*Id.*)  Defendant Pandya's plan was for Plaintiff "to continue with the hinged knee brace on the left knee and noted that [Plaintiff] should be in a one-level facility with flat ground or all indoors to eliminate weather related issues." (*Id.*)  That same day, Defendant Pandya placed an order for Plaintiff to receive X-rays of both knees, with patella views. (*Id.* ¶ 32.)

Plaintiff had X-rays of both knees done on February 3, 2017. (*Id.* ¶ 33.)  The X-rays showed "mild degenerative changes with soft tissue swelling and joint effusions." (*Id.*)  No fracture or dislocation in either knee was noted. (*Id.*)  Defendant Pandya reviewed the results on February 6, 2017, "noting that these were expected changes." (*Id.* ¶ 34.)  On February 10, 2017, Defendant Pandya placed an

order for Plaintiff to receive a hinged open patella knee brace for his left knee. (*Id.* ¶ 35.)

On February 15, 2017, Defendant Pandya referred Plaintiff to physical therapy and requested that the physical therapist evaluate Plaintiff "for function of his knees and level of disability." (*Id.* ¶ 36.) Defendant Pandya requested an evaluation to determine Plaintiff's "ability to walk on level floor/ground, how much distance, incline and use of steps or stairs were appropriate." (*Id.*) He asked the physical therapist to advise whether Plaintiff "was capable of washing his lower legs in the shower or whether he needed a shower stool/bench." (*Id.*) That same day, Defendant Pandya placed an order to add Plaintiff to his line on Tuesday. (*Id.* ¶ 37.)

On February 17, 2017, Plaintiff had physical therapy with Ronald Siejak. (*Id.* ¶ 38.) Mr. Siejak reviewed Plaintiff's medical history and Plaintiff "advised that he'd fallen in the shower 'last Wednesday.'" (*Id.*) He complained of significant pain with palpation and Mr. Siejak noted "he was only able to do a limited evaluation due to complaints of pain." (*Id.*) He noted that Plaintiff's brace was "ill-fitting and that [Plaintiff] was self-limiting to a degree and he suspected that [Plaintiff] could demonstrate improvement if he actively participated in the physical therapy." (*Id.*) Mr. Siejak suggested: "exercises as noted, advance to using crutches, that [Plaintiff's] knee brace must have a patella pad and horse shoe, that he should follow

up with the physical therapy clinic, that further recommendations were pending, and suggest prednisone regime." (*Id.*) After returning to SCI Frackville, Plaintiff advised RN Carla Orris that "he needed crutches to do his exercises and a new brace." (*Id.* ¶ 39.) That same day, Defendant Pandya referred Plaintiff to another physical therapy session. (*Id.* ¶ 40.) He noted that Plaintiff "had a history of multiple trauma to both leg and knee joints and that his last MRI of the left knee showed patella femoral mild arthritic changes." (*Id.*) Defendant Pandya indicated that Plaintiff "reported a recent fall in the shower to the physical therapist, but not to medical, and that he was advised to use crutches and perform exercises by his physical therapist." (*Id.*)

On February 22, 2017, Plaintiff saw Defendant Pandya and told him that "the physical therapist told him not to do any of the exercises [Defendant] Pandya showed him." (*Id.* ¶ 41.) He "further advised that he fell in the shower before his last physical therapy session and 'could not show him my problem' and complained that his knees hurt." (*Id.*) Defendant Pandya noted that when Plaintiff "straightened his leg to put on his brace, his patella appeared to be off-centered." (*Id.*) Defendant Pandya noted that the brace fit well and discussed hand washing the thermal used under the brace to reduce the smell. (*Id.*) Defendant Pandya's plan was "to await [Plaintiff's] physical therapy session in two (2) weeks." (*Id.*) Later that day,

Defendant Pandya ordered, and Plaintiff received, a new left knee brace for one (1) year. (*Id.* ¶ 42.)

On March 1, 2017, Plaintiff saw Defendant Pandya to "receive crutches and be fitted for a stockinette." (*Id.* ¶ 43.) He returned his cane and was issued crutches for one (1) year. (*Id.*) Defendant Pandya ordered that Plaintiff "be seen on the MD line in two (2) months." (*Id.*) Two (2) days later, Defendant Pandya "placed an order for a stockinette for [Plaintiff] to apply under his left knee brace." (*Id.* ¶ 44.) Defendant Pandya noted that Plaintiff "should be called down on Monday, March 6th, to be given the first one." (*Id.*)

On March 17, 2017, Plaintiff saw Mr. Siejak for physical therapy. (*Id.* ¶ 45.) Mr. Siejak noted that Plaintiff "had improved gait with the right crutch and improved functioning." (*Id.*) "His plan for [Plaintiff] included the use of a bell horn brace for his right knee and suggested regular use of a stationary bike." (*Id.*) On March 20, 2017, Plaintiff saw Defendant Pandya and asked to be transferred to a different facility, such as SCI Dallas, SCI Houtzdale, or SCI Somerset. (*Id.* ¶ 46.) Defendant Pandya assessed DJD in Plaintiff's left patella femoral and noted that he was developing DJD in his right patella femoral as well. (*Id.*) He noted "the physical therapist's recommendation for a right knee brace and the use of an exercise bike."

(*Id.*)  That same day, Defendant Pandya "placed an order for Plaintiff to receive a hinged open patella knee brace for his right knee."  (*Id.* ¶ 47.)

On March 30, 2017, Defendant Pandya referred Plaintiff to physical therapy for "post traumatic left patellofemoral joint problems and right patellofemoral pain syndrome."  (*Id.* ¶ 48.)  He noted that Plaintiff "would have a right open patella hinged brace to help improve mobility and was on crutches currently."  (*Id.*)  On April 4, 2017, Plaintiff went to physical therapy at SCI Mahanoy.  (*Id.* ¶ 49.)

On April 12, 2017, Plaintiff saw Defendant Pandya and told him that he "fell in the shower last night and his left knee swelled up."  (*Id.* ¶ 50.)  He "stated that he had no shower stool yet."  (*Id.*)  Defendant Pandya evaluated Plaintiff "and noted that his left knee was tender over the patellar tendon, but did not look bigger."  (*Id.*)  He noted that Plaintiff "had crutches and that his right thigh had muscle tone even though [Plaintiff] described some instability in his right knee."  (*Id.*)  Defendant Pandya ordered, and Plaintiff received, a right leg brace for one (1) year.  (*Id.* ¶ 51.)  Plaintiff was to see Defendant Pandya again in two (2) weeks.  (*Id.*)

On April 21, 2021, Plaintiff saw Mr. Siejak again for physical therapy.  (*Id.* ¶ 52.)  He noted that Plaintiff "must continue to use his braces and crutches."  (*Id.*)  Mr. Siejak "recommended a possible consult with an orthopedic physician for possible fluid in [Plaintiff's] knee following injuries to his right knee."  (*Id.*)

On April 24, 2017, Plaintiff saw Defendant Pandya and complained "that he could not use his left leg like he used to since he fell in the shower." (*Id.* ¶ 53.) Plaintiff "complained that his left knee hurts too much and pointed to the back of his right knee." (*Id.*) Plaintiff would not allow a more detailed examination, and Defendant Pandya wrote that Plaintiff "was 'always on guard.'" (*Id.*) Defendant Pandya "conducted an examination to the extent he could, noting that the ACL, PCL, MCL, and LCL appeared intact and there was no swelling in the areas of the right or left patella." (*Id.*) He ordered that Plaintiff continue physical therapy and receive a repeat MRI. (*Id.*)

Plaintiff saw Defendant Pandya again on May 1, 2017. (*Id.* ¶ 54.) He "complained that the back of his thigh muscles were weak and stated that he had been doing exercises." (*Id.*) Defendant Pandya noted that Plaintiff "was able to straighten his right knee with support and hold it, but complained of pain." (*Id.*) His plan "was to await the MRI results and he encouraged [Plaintiff] to continue exercises, specifically single leg [lifts], to increase strength and to continue use of both knee braces." (*Id.*) Two (2) days later, Defendant Pandya "placed orders to transfer Plaintiff to a single level facility, noting that [Plaintiff] needs to be at a single level facility without inclines." (*Id.* ¶ 55.) He also "ordered a shower stool or chair, crutches, and a horseshoe hinged-knee brace with pads for both knees." (*Id.*)

On May 5, 2017, Plaintiff had an MRI of his knees done at Lehigh Valley Hospital. (*Id.* ¶ 56.) The MRI "showed signs of chronic lateral patellar instability in his left knee and patellofemoral arthritis in his right knee." (*Id.*) Three (3) days later, Plaintiff saw Defendant Pandya to discuss "the recent MRI results and leg pain." (*Id.* ¶ 57.) Plaintiff "reported that his left calf was smaller than his right. He also advised that his right leg shakes and he was experiencing some numbness." (*Id.*) Defendant Pandya counseled Plaintiff "on the importance of sit down and lying range of motion exercises and instructed him to increase walking without crutches." (*Id.*) He noted that Plaintiff "was still participating in physical therapy appointments and that [he] would start pedal exercise soon." (*Id.*) Plaintiff was transferred to SCI Mahanoy on June 12, 2017. (*Id.* ¶ 58.)

## IV. DISCUSSION

### A. Defendant Pandya's Motion for Summary Judgment

#### 1. Eighth Amendment Claims[10]

In the context of medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). To establish an Eighth Amendment deliberate indifference claim, a claimant must demonstrate "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197. The "deliberate indifference" prong of the Eighth Amendment test

---

[10] Plaintiff also suggests that Defendant Pandya's conduct violated his rights under the Fourteenth Amendment's Due Process Clause. However, in adopting the "more-specific-provision-rule" established in *County of Sacramento v. Lewis*, 523 U.S. 833, 843-44 (1998), the Third Circuit has noted that "[u]nder this rule, 'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'" *Betts v. New Castle Dev. Ctr.*, 621 F.3d 249, 260-61 (3d Cir. 2010).

requires that the defendant actually know of and disregard "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Circumstantial evidence can establish subjective knowledge if it shows that the excessive risk was so obvious that the official must have known about it. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 842)). Moreover, "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Accordingly, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.*

The second prong of the Eighth Amendment inquiry is whether the plaintiff's medical needs were serious. A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). Not every condition is a serious medical need; instead, the serous medical need element contemplates a condition of urgency, namely, one that may produce death, degeneration, or extreme

pain.  *See id.*  Moreover, because only egregious acts or omissions can violate this standard, mere medical malpractice cannot result in an Eighth Amendment violation. *See White v. Napoleon*, 897 F.2d 103, 108-10 (3d Cir. 1990); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (noting that "medical malpractice does not become a constitutional violation merely because the victim is a prisoner").

Additionally, prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients, *see Young v. Kazmerski*, 266 F. App'x 191, 194 (3d Cir. 2008), and a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment.  *See White*, 897 F.2d at 108-10.  Furthermore, it is well settled that an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim.  *See Taylor v. Norris*, 36 F. App'x 228, 229 (8th Cir. 2002); *Abdul-Wadood v. Nathan*, 91 F.3d 1023, 1024-25 (7th Cir. 1996); *Sherrer v. Stephens*, 50 F.3d 496, 497 (8th Cir. 1994); *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) (noting that "[as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights"); *see also Pearson v. Prison Health Servs.*, 850 F.3d 526, 535 (3d Cir. 2017) (noting that "when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care").

In his complaint, Plaintiff suggests that Defendant Pandya violated his Eighth Amendment rights by not providing adequate medical care for his knee condition. Specifically, Plaintiff suggests that Defendant Pandya discontinued his pain medication, took away his "permanent walker," and never referred him to a patella specialist. However, Plaintiff's medical records indicate that on January 12, 2016, he was offered pain medications and stated that he did not want any and that he wouldn't take them. (Doc. No. 101-1 at 79.) Moreover, although Plaintiff was issued what was marked as a "permanent" walker on February 4, 206, it was noted that Plaintiff's use of the walker would be reviewed on February 4, 2017. (*Id.* at 98.) On March 8, 2016, however, RN Kuras wrote a note indicating that Plaintiff had been seen walking with his walker in his hands but not using the walker for assistance. The walker was barely touching the ground, and he walked back up the compound using the walker in the same manner. (*Id.* at 68.) Based on this observation, Defendant Pandya discontinued the walker and placed an order for Plaintiff to receive a cane. (*Id.* at 37, 97.) Moreover, while Plaintiff's physical therapist did recommend a possible consultation with an orthopedic physician (Doc. No. 101 ¶ 52), the record reflects that Defendant Pandya placed orders for Plaintiff to receive MRIs to determine whether a referral was necessary (*id.* ¶¶ 53-56). Plaintiff had the MRIs done on May 5, 2017; however, he was transferred from SCI

Frackville—and Defendant Pandya's care—approximately a month later. (*Id.* ¶¶ 56, 58.)

The Third Circuit has made there "that there is a critical distinction 'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'" *Pearson*, 850 F.3d at 535 (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)). Here, nothing in the record before the Court could lead a reasonable juror to conclude that Defendant Pandya demonstrated deliberate indifference to Plaintiff's medical needs. Plaintiff's claims amount to no more than a disagreement with the treatment provided, which is insufficient to maintain an Eighth Amendment claim. *See Gause v. Diguglielmo*, 339 F. App'x 132, 136 (3d Cir. 2009) (characterizing a dispute over pain medication as the type of "disagreement over the exact contours of [Plaintiff's] medical treatment" that does not violate the Constitution); *see also White*, 897 F.2d at 108-10 (noting that a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment).

Overall, the record before the Court indicates that Plaintiff was offered a variety of treatments, some of which he accepted and some of which he declined. Of note, Plaintiff declined to perform strengthening exercises to help stabilize his knees. Moreover, Defendant Pandya did not deny medical treatment at any time.

Rather, he referred Plaintiff for X-rays, MRIs, and physical therapy, and also provided a variety of assistive devices, including braces, a walker, and a cane. Moreover, he eventually provided a shower stool and recommended that Plaintiff be transferred to a different institution. Plaintiff, as a prisoner, is not entitled to the treatment of his choice. *See Reed v. Cameron*, 380 F. App'x 160, 162 (3d Cir. 2010). The record does not reflect that Defendant Pandya knew of Plaintiff's need for medical treatment and intentionally refused to provide it, delayed necessary medical treatment for a non-medical reason, or prevented Plaintiff from receiving needed or recommended medical treatment. *See Rouse*, 182 F.3d at 197. The Court, therefore, will grant Defendant Pandya summary judgment with respect to Plaintiff's Eighth Amendment claims.

### 2. First Amendment Retaliation Claim

Plaintiff suggests that Defendant Pandya retaliated against him for "writing requests to his boss and filing grievances" by stopping his pain medication "after 30 days of being prescribed." (Doc. No. 5 ¶ 23.) To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three (3) elements. First, a plaintiff must prove that he was engaged in a constitutionally protected activity. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials."

*Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Id.* (quoting *Suppon v. Dadonna*, 2013 F.3d 228, 235 (3d Cir. 2000)). Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." *Rauser*, 241 F.3d at 333-34 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events. *See Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005). Only when the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, on its own, support an inference of causation. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). The Third Circuit has noted that an inmate can satisfy this burden "with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2002).

If a prisoner establishes a *prima facie* case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. "This is often referred to as the 'same decision defense.'" *Watson*, 834 F.3d at 422. If the prison officials can make this showing, it defeats the retaliation claim. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

The filing of grievances constitutes protected activity. *See Mearin v. Vidonish*, 450 F. App'x 100, 102 (3d Cir. 2011). However, the record before the Court does not support Plaintiff's claim that Defendant Pandya stopped his pain medication to retaliate against Plaintiff for using the grievance system. While "a delayin providing, or denial of medical treatment constitutes adverse action for purposes of a retaliation claim," *Thomas v. Brinich*, No. 1:12-cv-1539, 2014 WL 956983, at *5 (M.D. Pa. Mar. 12, 2014), as noted *supra*, Plaintiff's medical records indicate that on January 12, 2016, when asked about medications, Plaintiff specifically said that he did not want pain medications and that would not take them. (Doc. No. 101-1 at 76, 79.) Thus, the record does not demonstrate that Defendant Pandya took adverse action against Plaintiff.

Moreover, even if Defendant Pandya's actions can be said to somehow constitute adverse action, the Court cannot conclude that his actions were motivated by Plaintiff's protected conduct. Plaintiff essentially alleges that Defendant Pandya provided inadequate care, he grieved this care, and Defendant Pandya continued to provide inadequate care. The record is devoid of any grievances filed by Plaintiff prior to the alleged stoppage of his pain medication. Thus, the record suggests that Defendant Pandya took the alleged "adverse action" before Plaintiff filed any grievances. Thus, the Court cannot conclude that the filing of grievances was a substantial or motivating factor in Defendant Pandya's alleged action. *See Whitenight v. Harry*, No. 4:16-cv-1350, 2019 WL 1782139, at *13 (M.D. Pa. Jan. 23, 2019), *report and recommendation adopted*, 2019 WL 1779507 (M.D. Pa. Apr. 23, 2019). The Court, therefore, will grant summary judgment to Defendant Pandya with respect to Plaintiff's First Amendment retaliation claim.

### 3. Claims Under the ADA and the Rehabilitation Act

Plaintiff also alleges that Defendant Pandaya violated Title II of the ADA as well as the Rehabilitation Act by failing to provide the proper accommodations for his disabilities. (Doc. No. 5 ¶ 94.)[11] As the Court previously noted, while the Third

---

[11] Plaintiff also claims that Defendant Pandya's actions violated Title III of the ADA. (Doc. No. 5 ¶ 94.) Title III states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182. Public

Circuit has not addressed the issue precedentially, most courts "have held that Title II does not authorize suits against government officers in their individual capacities." *Williams v. Hayman*, 657 F. Supp. 2d 488. 502 (D.N.J. 2008); *see also Bowens v. Wetzel*, 674 F. App'x 133, 136 (3d Cir. 2017) (noting that "the District Court could have properly followed the holdings of those circuits which have concluded that there is no individual damages liability under Title II of the ADA, which provides an additional basis to affirm the dismissal of this claim"); *Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 169-70 (3d Cir. 2015) (agreeing with the Second and Eighth Circuits that "Title II of the ADA does not provide for suits against state officers in their individual capacities"). Likewise, individuals who are employees of entities who receive federal funds are not subject to individual liability under the Rehabilitation Act. *See Olschefski v. Red Lion Area Sch. Dist.*, No. 1:12-cv-871, 2012 WL 6003620, at *8 (M.D. Pa. Nov. 30, 2012). Plaintiff, therefore, cannot maintain his ADA and Rehabilitation Act claims against Defendant Pandya in his official capacity.

---

accommodations include service establishments such as hospitals, gas stations, laundromats, etc., "if the operations of such entitles affect commerce." *Id.* § 12181(7)(F). Nothing in the record before the Court suggests that SCI Frackville and SCI Mahanoy and, by extension, the DOC, could be considered service establishments. *See Harris v. Lanigan*, No. 11-1321 (MLC), 2012 WL 983749, at *4 (D.N.J. Mar. 22, 2012) (concluding same regarding correctional facilities in New Jersey). The Court, therefore, will only consider Plaintiff's claims pursuant to Title II of the ADA.

To the extent Plaintiff asserts his ADA and Rehabilitation Act claims against Defendant Pandya in his official capacity, he cannot maintain such claims. Under Title II of the ADA, plaintiffs may sue for prospective injunctive relief against state officials. *See Koslow v. Commonwealth*, 302 F.3d 161, 179 (3d Cir. 2002) (noting that "federal ADA claims for prospective injunctive relief against state officials are authorized by the *Ex Parte Young* doctrine"). Plaintiff's transfer from SCI Frackville, however, moots his claims for prospective injunctive relief under the ADA and Rehabilitation Act. *See Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) (noting that "[a]n inmate's transfer from the facility complained of generally moots the equitable and declaratory claims" for relief); *see also Reaves v. Dep't of Corr.*, 392 F. Supp. 3d 195, 210 (D. Mass. 2019) (concluding that inmate's transfer mooted his claims pursuant to Title II of the ADA and the Rehabilitation Act). Moreover, Defendant Pandya, as a private medical provider contracted to serve SCI Frackville, is not a public entity for purposes of the ADA and Rehabilitation Act. *See Matthews*, 613 F. App'x at 170 (noting that a private corporation does not become a public entity by contracting with a public entity to provide a service); *Cox v. Jackson*, 579 F. Supp. 2d 831, 852 (E.D. Mich. 2008) (concluding that a private medical provider with a contract to serve a prison was not a governmental entity).

The Court, therefore, will grant Defendant Pandya summary judgment with respect to Plaintiff's ADA and Rehabilitation Act claims.

### 4. State Law Claims

#### a. Claims Under the Pennsylvania Constitution

Plaintiff seeks relief pursuant to an unspecified section of the Pennsylvania Constitution. (Doc. No. 5 ¶ 95.) As the Third Circuit has recognized, however, "[n]o Pennsylvania statute establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution." *See Pocono Mtn. Charter Sch. v. Pocono Mtn. Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011). Individual plaintiffs may "bring suit for injunctive relief under the Pennsylvania Constitution." *Moeller v. Bradford Cty.*, 444 F. Supp. 2d 316, 320 (M.D. Pa. 2006). However, as noted *supra*, Plaintiff is no longer incarcerated at SCI Frackville. His claims for injunctive relief, are, therefore, moot. *See Gillette v. Prosper*, --- F. App'x ----, 2021 WL 1626515, at *2 (3d Cir. Apr. 27, 2021) (citing *Sutton*, 323 F.3d at 248, and *Abdul-Akbar v. Watson*, 4 F.3d 195, 206 (3d Cir. 1993)). Defendant Pandya is, therefore, entitled to summary judgment with respect to such claims.

### b. Intentional Infliction of Emotional Distress

Plaintiff also asserts a claim for intentional infliction of emotional distress against Defendant Pandya. (Doc. No. 5 ¶ 98.) Under Pennsylvania law, an action for intentional infliction of emotional distress "requires a plaintiff to show that (1) the conduct is extreme; (2) the conduct is intentional or reckless; (3) the conduct caused emotional distress; and (4) the distress is severe." *Kornegey v. City of Phila.*, 299 F. Supp. 3d 675, 683 (E.D. Pa. Mar. 6, 2018). The plaintiff must demonstrate that the defendant's conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *McGreevy v. Stroup*, 413 F.3d 359, 371 (3d Cir. 2005). "Pennsylvania courts have found extreme and outrageous conduct only in the most egregious of situation, such as mishandling of a corpse, reckless diagnosis of a fatal disease, and having sexual contact with young children." *Cheney v. Daily News L.P.*, 654 F. App'x 578, 583-84 (3d Cir. 2016).

Courts within the Third Circuit have entertained such claims only in the most extreme cases of prisoner litigation regarding medical treatment. For example, the United States District Court for the Eastern District of Pennsylvania has denied summary judgment when the record suggested that the physician in question refused the plaintiff's request to see other physicians, cancelled appointments with necessary

specialists, and placed the plaintiff in "reverse isolation." *See Miller v. Hoffman*, No. CIV. A. 97-7987, 1999 WL 415397, at *8-9 (E.D. Pa. June 22, 1999). Likewise, the Eastern District has concluded that "a continuous, deliberate refusal to provide necessary treatment for a brain tumor, together with verbal abuse[,] could support a claim of intentional infliction of emotional distress." *Rodriguez v. Smith*, No. Civ.A. 03-3675, 2006 WL 680965, at *15 (E.D. Pa. Mar. 16, 2006).

Courts within the Third Circuit have found that intentional infliction of emotional distress claims fail when the allegations are regarding a dispute as to the course of treatment and do not amount to "outright refusal to provide medical care." *Charleston v. Corizon Health, Inc.*, No. 17-3039, 2018 WL 17576060, at *22 (E.D. Pa. Apr. 12, 2018); *see also Cowher v. Pike Cty. Corr. Facility*, No. 3:16-cv-2259, 2018 WL 2717992, at *5 (M.D. Pa. June 6, 2018). For example, the late Honorable William J. Nealon of this Court concluded that an inmate could not maintain an intentional infliction of emotional distress claim when he alleged that the defendants failed to provide adequate treatment for his Achilles tendon injury, even when it led to permanent loss of use of his right foot and leg. *See Baumgardner v. Ebbert*, No. 4:10-cv-1459, 2013 WL 1249040, at *16-17 (M.D. Pa. Mar. 26, 2013), *aff'd*, 535 F. App'x 72 (3d Cir. 2013).

As discussed above, this is not a case where Defendant Pandya outright refused to provide medical treatment to Plaintiff. Rather, Plaintiff is simply dissatisfied with the course of treatment provided. Nothing in the record before the Court would lead a reasonable juror to conclude that Defendant Pandya acted in a way that could be considered extreme or outrageous. Moreover, to recover for intentional infliction of emotional distress, Plaintiff "must support [his] claims with competent medical evidence in the form of exert medical evidence." *Simril v. Twp. of Warwick*, No. CIV.A. 00-5668, 2003 WL 1204104, at *2 (E.D. Pa. Mar. 18, 2003). Plaintiff has not done so here. Accordingly, the Court will grant summary judgment to Defendant Pandya with respect to Plaintiff's intentional infliction of emotional distress claim.

### c.     Negligence

Finally, Plaintiff asserts a claim for negligence against Defendant Pandya. To maintain a negligence claim under Pennsylvania law, a plaintiff must demonstrate: "(1) a duty on the part of the defendant to conform to a certain standard of conduct with respect to the plaintiff; (2) a breach of that duty by the defendant; (3) a causal connection between the defendant's conduct and the injury suffered by the plaintiff; and (4) actual loss or damage suffered by the plaintiff." *See Harris v. Oz Directional Drilling, Inc.*, No. 3:13-cv-2580, 2016 WL 4578150, at *3 (M.D. Pa. June 30, 2016),

*report and recommendation adopted*, 2016 WL 4698635 (M.D. Pa. July 19, 2016).

Furthermore, to maintain a *prima facie* case of medical negligence, "as a general rule, a plaintiff has the burden of presenting expert opinions that the alleged act or omission of the defendant physician or hospital personnel fell below the appropriate standard of care in the community, and that the negligent conduct caused the injuries for which recovery is sought." *See Simpson v. Bureau of Prisons*, No. 02-2213, 2005 WL 2387631, at *5 (M.D. Pa. Sept. 28, 2005).

Under Rule 1042.3 of the Pennsylvania Rules of Civil Procedure, plaintiffs seeking to raise medical negligence claims must file a valid certificate of merit. That rule states in pertinent part:

> (a) In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party that either []
>
> (1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or
>
> (2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or

(3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

Pa. R. Civ. P. 1042.3. The requirements of Rule 1042.3 are substantive in nature and, therefore, federal courts in Pennsylvania must apply these prerequisites of Pennsylvania law when assessing the merits of a medical malpractice claim. *See Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 262-65 (3d Cir. 2011); *Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x 938, 944 (3d Cir. 2007). This requirement applies with equal force to counseled complaints and to *pro se* medical malpractice actions asserted under state law. *See Hodge v. Dep't of Justice*, 372 F. App'x 264, 267 (3d Cir. 2010) (affirming district court's dismissal of medical negligence claim for failure to file a certificate of merit); *Levi v. Lappin*, No. 07-1839, 2009 WL 1770146, at *1 (M.D. Pa. June 22, 2009).

On March 16, 2020, Plaintiff filed a motion to determine the necessity to file a certificate of merit. (Doc. No. 80.) He stated that "at this stage of the proceedings that the testimony of a licensed professional is unnecessary for [his] claims to move forward and/or go to trial against the defendant Pandya." (*Id.*) In an Order dated April 21, 2020, the Court granted Plaintiff's motion to the extent that Plaintiff's statement that expert testimony is unnecessary served as his certificate of merit in compliance with Rule 1042.3(a)(3). (Doc. No. 85.) "Should a plaintiff certify that expert testimony is unnecessary, 'in the absence of exceptional circumstances the

45

attorney is bound by the certification and, subsequently, the trial court shall preclude the plaintiff from presenting testimony by an expert on the questions of standard of care and causation.'" *See Rodriguez v. United States*, No. 3:14-cv-1149, 2016 WL 4480761, at *4 (M.D. Pa. Aug. 23, 2016) (quoting Pa. R. Civ. P. 1042.3(a)(3)), *aff'd*, 695 F. App'x 669 (3d Cir. 2017). In short, "the consequence of such a filing is a prohibition against offering expert testimony later in the litigation, absent 'exceptional circumstances.'" *See Liggon-Redding*, 659 F.3d at 265.

Moreover, the Supreme Court of Pennsylvania has noted that because "the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff [typically] must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury." *See Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003). A very narrow exception applies "where the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons." *See Hightower-Warren v. Silk*, 698 A.2d 52, 54 n.1 (Pa. 1997). However, three (3) conditions must be met before the doctrine of *res ipsa loquitur* may be invoked:

> (a) either a lay person is able to determine as a matter of common knowledge, or an expert testifies, that the result which has occurred does not ordinary occur in the absence of negligence; (b) the agent or instrumentality causing the harm was within the exclusive control of

46

> the defendant; and (c) the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and complete explanation of the event.

*See Toogood*, 824 A.2d at 1149-50.

In the instant case, Plaintiff suggests that *res ipsa loquitur* applies and that expert testimony is not necessary because a lay person would be able to discern negligence from Defendant Pandya's failure to provide pain medication and failure to transfer Plaintiff to a handicap-accessible facility. (Doc. No. 115 at 18.) The Court disagrees and instead concludes that Plaintiff requires expert testimony to establish that Defendant Pandya was negligent and that his alleged failure to provide proper treatment exacerbated Plaintiff's conditions. *See Sutton v. Cerullo*, No. 3:10-cv-1899, 2016 WL 1393390, at *6 (M.D. Pa. Apr. 8, 2016) (granting summary judgment because the inmate-plaintiff failed to offer expert testimony regarding his plantar fasciitis, concluding that his "foot pain" and foot condition were "not within the ordinary knowledge of the jury"); *Crum v. United States*, No. 06-250 Erie, 2009 WL 693262, at *7-9 (W.D. Pa. Mar. 13, 2009) (concluding that the inmate-plaintiff's failure to provide expert testimony regarding the defendant's failure to prescribe medication was fatal to his medical negligence claim). Plaintiff, therefore, "may not rely upon Rule 1042.3(a)(3) or the doctrine of *res ipsa loquitur* to carry his burden of proof on the issues of negligence and causation that are central to this tort claim."

*See Njos v. United States*, No. 3:15-cv-931, 2017 WL 6949812, at *7 (M.D. Pa. Oct. 17, 2017), *report and recommendation adopted*, 2018 WL 453441 (M.D. Pa. Jan. 17, 2018). Plaintiff has "not provided a competent declaration from an appropriate licensed professional which satisfies the requirements of Pennsylvania law." *See id.* at *8. Defendant Pandya, therefore, is entitled to summary judgment with respect to Plaintiff's medical negligence claim.

### B.     DOC Defendants' Motion for Summary Judgment

#### 1.     ADA and Rehabilitation Act Claims

As noted *supra*, the Court previously granted summary judgment to the DOC Defendants with respect to Plaintiff's ADA and Rehabilitation Act claims against them in their individual capacities, as well as any claims seeking prospective injunctive relief. *Johnson*, 2020 WL 1911538, at *12. Plaintiff's remaining official capacity claims for damages against the DOC Defendants are treated as claims against the DOC because the real party in interest is the DOC. *See Rogers v. NJDOC*, No. 15-7005, 2021 WL 1050233, at *15 (D.N.J. Mar. 19, 2021).

Title II of the ADA, "which prohibits 'a public entity' from discriminating against a 'qualified individual with a disability' on account of that individual's disability, covers inmate in state prisons." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 208 (1998) (quoting 42 U.S.C. §§ 12141 & 12132). The Rehabilitation Act

provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Third Circuit has explained that "[t]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275 (3d Cir. 2014) (quoting *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 282-83 (3d Cir. 2012)). Therefore, to maintain a claim under either the ADA or the Rehabilitation Act, Plaintiff must demonstrate "that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019). He must show that he was "excluded from the program [at issue] solely" because of his disability. *Iseley v. Beard*, 200 F. App'x 137, 142 (3d Cir. 2006).

Plaintiff seeks compensatory and punitive damages. Punitive damages, however, are not available under Title II of the ADA and section 504 of the Rehabilitation Act. *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 346 F.3d 402, 429 (3d Cir. 2003) (citing *Barnes v. Gorman*, 536 U.S. 181, 187 (2002)). To receive compensatory damages, Plaintiff must demonstrate "intentional discrimination

under a deliberate indifference standard." *Furgess*, 933 F.3d at 288-89. The "definition of deliberate indifference in the . . . ADA context is consistent with [the] standard of deliberate indifference in the context of § 1983 suits by prison inmates." *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013). Thus, to show deliberate indifference, Plaintiff must show that the DOC "(1) had 'knowledge that a federal protected right is substantially likely to be violated,' and (2) failed 'to act despite that knowledge.'" *See Snider v. Pa. DOC*, --- F. Supp. 3d ----, 2020 WL 7229817, at *19 (M.D. Pa. Dec. 8, 2020) (quoting *Geness v. Admin. Office of Pa. Courts*, 974 F.3d 263, 274 (3d Cir. 2020)). Plaintiff can show such a right was "substantially likely to be violated" by either "(1) alleging 'a failure to adequately respond to a patter of past occurrences of injuries like [his]"; or (2) alleging facts that 'prove that the risk of . . . cognizable harm was so great and so obvious that the risk and the failure . . . to respond will alone support finding deliberate indifference." *Matthews v. Pa. Dep't of Corr.*, 827 F. App'x 184, 187 (3d Cir. 2020) (quoting *Haberle v. Troxell*, 885 F.3d 170, 181 (3d Cir. 2018)).

As an initial matter, to the extent Plaintiff claims that his rights under the ADA and Rehabilitation Act were violated because he was denied medical treatment for his disabilities, such a claim "is not encompassed by the ADA's prohibitions." *Iseley*, 200 F. App'x at 142; *see also Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir.

50

1996) (concluding that the ADA "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners [because the] ADA does not create a remedy for medical malpractice").  Plaintiff appears to assert that he was denied the following programs, activities, and/or services while incarcerated at SCI Frackville: (1) not being provided the use of a chair to use the phone; (2) not being provided a chair to use in the shower; and (3) not being able to eat at the dining hall. (Doc. No. 5 ¶¶ 27, 42, 60.)  Plaintiff suggests that the DOC had knowledge that he required accommodations for his impairment because of the multiple grievances he submitted regarding his medical care and need for accommodations. (Doc. No. 112.) The grievances submitted to Plaintiff's complaint suggest that on multiple occasions, he raised the issues of not being provided a chair to use the phone and shower. (Doc. No. 5.)  Moreover, Plaintiff mentioned being unable to walk to the dining hall without experiencing pain.  (*Id.*)

In its previous Memorandum, which analyzed Plaintiff's Eighth Amendment claims against the DOC Defendants, the Court concluded that Plaintiff had not met a similar deliberate indifference standard.  *Johnson*, 2020 WL 1911538, at *5-9. Specifically, the Court noted that the DOC Defendants, who are not medical personnel, were justified in relying on the expertise and care provided to Plaintiff by his medical providers.  *See id.*  The Court concluded further that Plaintiff had not

demonstrated that the DOC Defendants had reason to believe or actual knowledge that his medical providers were mistreating or failing to treat him. *Id.* (citing *Spruill*, 372 F.3d at 236). Likewise, as the Court has concluded *supra*, Defendant Pandya did not demonstrate deliberate indifference to Plaintiff's medical needs. Thus, given the Court's previous conclusion, and because the "definition of deliberate indifference in the RA and the ADA context is consistent with [the] standard of deliberate indifference in the context of §1983 suits by prison inmates," the Court reaches the same conclusion here. *Matthews*, 827 F. App'x at 188. The Court, therefore, will grant the DOC Defendants summary judgment with respect to Plaintiff's official capacity claims for compensatory damages pursuant to the ADA and the Rehabilitation Act.

### 2. State Law Claims

Plaintiff also raises several tort claims against the DOC Defendants pursuant to Pennsylvania state law. (Doc. No. 5 at 1.) Specifically, he alleges "the torts of [n]egligence, [r]ecklessness, and intentional infliction of distress." (*Id.*) The DOC Defendants assert that recklessness is not a cause of action and that they are entitled to sovereign immunity as to the other state law claims. (Doc. No. 88 at 11-13.)

Under Pennsylvania's sovereign immunity statute, "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to

52

enjoy sovereign and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." *See* 1 Pa. Cons. Stat. Ann. § 2310. Pursuant to Section 8522(b) of Title 42, the following nine exceptions to sovereign immunity are recognized: (1) operation of any motor vehicle in the possession or control of a Commonwealth party; (2) acts of health care employees of Commonwealth agency medical facilities or institutions; (3) care, custody, or control of personal property in the possession or control of Commonwealth parties; (4) dangerous conditions posed by Commonwealth agency real estate and sidewalks; (5) dangerous conditions of highways under the jurisdiction of Commonwealth agency that are created by potholes or sinkholes or other similar conditions created by natural elements; (6) care, custody, or control of animals in the possession or control of a Commonwealth party; (7) sale of liquor at Pennsylvania liquor stores; (8) acts of a member of the Pennsylvania military forces; and (9) administration, manufacture and use of a toxoid or vaccine. *See* 42 Pa. Cons. Stat. Ann. § 8522(b).

In the instant case, Plaintiff appears to assert medical malpractice claims against the DOC Defendants. However, it is well settled that such immunity is waived only for claims asserted against health care employees and not against individuals who are not medical professionals. *See McCool v. Dep't of Corr.*, 984 A.2d 565, 570 (Pa. Cmwlth. Ct. 2009). In the instant case, none of the DOC

53

Defendants are medical professionals, and the "DOC itself is not a health care employee." *See Green v. Fisher*, No. 1:12-cv-982, 2013 WL 664677, at *6 (M.D. Pa. Feb. 22, 2013); *see also Beckett v. Pa. Dep't of Corr.*, 597 F. App'x 665, 667 (3d Cir. 2015). Accordingly, the DOC Defendants are entitled to sovereign immunity with respect to Plaintiff's medical malpractice claims.

Moreover, sovereign immunity applies even to intentional torts committed by Commonwealth defendants acting in their individual capacities. *See Story v. Mechling*, 412 F. Supp. 2d 509, 518 (W.D. Pa. 2006), *aff'd*, 214 F. App'x 161 (3d Cir. 2007). Sovereign immunity "applies to Commonwealth employees in both their official and individual capacities, so long as the employees are 'acting within the scope of their duties.'" *See Larsen v. State Emps' Ret. Sys.*, 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008).

> Under Pennsylvania law, an action falls within the scope of employment if it: (!) is the kind that the employee is employed to perform; (2) occurs substantially within the job's authorized time and space limits; (3) is motivated at least in part by a desire to serve the employer; and (4) if force was used by the employee against another, the use of force is not unexpectable by the employer.

*Savage v. Judge*, No. 05-2551, 2007 WL 29283, at *5 (E.D. Pa. Jan. 2, 2007). Moreover, "even unauthorized acts may be within the scope of employment 'if they are clearly incidental to the [employer's] business.'" *Brumfield v. Sanders*, 232 F.3d 376, 381 (3d Cir. 2000) (quoting *Shuman Estate v. Weber*, 276 Pa. Super. 209, 216,

419 A.2d 169 (1980)).  In this matter, the relevant evidence of record demonstrates that the DOC Defendants were acting within the scope of their employment. Accordingly, because they are entitled to sovereign immunity, the Court will grant the DOC Defendants summary judgment as to Plaintiff's state law tort claims.

## V.    CONCLUSION

For the foregoing reasons, the Court will grant the DOC Defendants' second motion for summary judgment (Doc. No. 86) and Defendant Pandya's motion for summary judgment (Doc. No. 100).  An appropriate Order follows.

s/ Sylvia H. Rambo
United States District Judge

Date: June 22, 2021